660 P.2d 941

**Ronal M. DINGLEY, Claimant-Appellant,**

v.

**BOISE CASCADE CORPORATION, Employer-Defendant-Respondent,**

**and**

**State of Idaho, Department of Employment, Respondent.**

No. 14334.

Supreme Court of Idaho.

March 17, 1983.

Thomas G. Maile, IV, Boise, for claimant-appellant.

Robin B. Wilcox, Boise, for employer-defendant-respondent.

Lynn E. Thomas, Sol. Gen., Roger Martindale and Carol Lynn Brassey, Deputy Attys. Gen., Boise, for respondent.

SHEPARD, Justice.

This is an appeal from an order of the Industrial Commission denying unemployment compensation benefits on the basis that the claimant was discharged for misconduct in connection with employment. The sole issue is whether the evidence supports the Commission's decision. We affirm.

Dingley had been employed for some time as a logging truck driver for Boise Cascade. His employment was terminated following an incident on January 7, 1981. During 1979 and 1980 Dingley had received written reprimands for the unauthorized use of a vehicle and for tardiness in reporting for work. Dingley's admitted drinking problem had also been discussed with him by a supervisor.

On January 6, 1981, Dingley was again reprimanded by his supervisor for tardiness in reporting for work. On January 6, Dingley's work shift ended at 5:00 p.m., following which he slept for four hours, ate dinner at about 10:00 p.m. and then spent until 1:00 a.m. drinking beer in a bar. He spent the next two hours in a car with a female friend and then reported late for work shortly after 3:00 a.m. January 7, 1981. Upon his arrival at work, Dingley was met by his supervisor, who noted the smell of liquor and that Dingley's speech was not normal. The supervisor concluded that Dingley was under the influence of alcohol,

would not permit him to drive, and thereupon suspended Dingley from work. Later, after Dingley's personnel record was reviewed, he was discharged.

A claimant is not entitled to unemployment benefits if he was discharged for misconduct·in connection with his employment. I.C. § 72–1366(f). The application of that statutory language has been the subject of discussion by this Court in *Wroble v. Bonners Ferry Ranger Station,* 97 Idaho 900, 556 P.2d 859 (1976); *Oliver v. Creamer Heating & Appliance,* 91 Idaho 312, 420 P.2d 795 (1966); *O'Neal v. Employment Security Agency,* 89 Idaho 313, 404 P.2d 600 (1965); *Johns v. S.H. Kress & Company,* 78 Idaho 544, 307 P.2d 217 (1957), and no reiteration is necessary here. Here, albeit Dingley's "misconduct" had its roots in off duty hours, his condition when he reported for work was violative of the employer's interests and of standards which the employer was entitled to expect and enforce. *See Oliver v. Creamer Heating & Appliance, supra.*

We hold there is sufficient evidence to support the Commission's decision that Dingley was guilty of misconduct in connection with his employment and affirm the order of the Industrial Commission denying unemployment compensation benefits. Costs to respondents.

We again note, as was the case in *White v. Idaho Forest Industries,* 98 Idaho 784, 572 P.2d 887 (1977), the appearance of the "Gibbens Company" purporting to represent the employer herein at the administrative level. As in *White,* we direct that the Idaho State Bar again make such investigation and take such action as is appropriate. An order will issue.

DONALDSON, C.J., and BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, concurring.

Readily agreeing with the majority's conclusion that a truck driver fired for arriving at work under the influence of alcohol is fired for misconduct in connection with his employment, I am troubled in that such does not answer the real question in this case—a question the majority does not address: Is there substantial competent evidence to support the Commission's finding that Dingley arrived at work on January 7, 1981, under the influence of alcohol?

The Court's general recitation of the facts of this case does not point to the specific evidence which provides support for the Commission's determination. The opinion recites that Dingley slept for four hours the day before the incident in question, that he "ate dinner and then spent until 1:00 a.m. drinking beer in a bar," that he "spent the next two hours in a car with a female friend and then reported late for work shortly after 3:00 a.m. January 7, 1981." The Court further recites the supervisor's opinion that he "noted the smell of liquor and that Dingley's speech was not normal." Such bare recitation of the facts is consistent with the result reached, but omits or glosses over other facts.

There is no dispute that Dingley slept four hours on the day before the incident, but Dingley testified that he often slept as little as four hours a night and that he felt comfortable with that amount of sleep. Although the majority states that Dingley spent the time from about 10:00 p.m. until 1:00 a.m. "drinking beer in a bar" (which might lead one to surmise that Dingley had consumed a large quantity of beer), the Commission *found* that Dingley had three beers in that time period, ending at 1:00 a.m., and further noted that Dingley testified that he did not drink all of the third beer. The record demonstrates—and the Commission implicitly found—that Dingley did not drink between 1:00 a.m. and 3:00 a.m., the approximate time of his arrival at work. The only other evidence relevant to the critical issue was the testimony of his supervisor, Don Menter. On direct examination, Menter testified:

"Q. Okay. Would you please describe what happened when he came to work on January 7th? What time was he scheduled to arrive?

"A. He got there about 5 minutes after 3. He was scheduled to be there at 3 o'clock.

"Q. And did you see him when he arrived?

"A. Yes, I did ... I was watching for him to arrive.

"Q. And why was that?

"A. Well, because .. I seen his pickup downtown as I came to work.

"Q. What time did you go to work?

"A. I went to the office that morning about 2:30.

"Q. All right, and what happened when he did arrive at work?

"A. When he arrived at work, why he started up his truck and I went and talked to him and I could smell liquor, and I just told him that I didn't think that he should drive .. that he should go to the bunkhouse.

"Q. Did he appear to be capable of driving?

"A. Not to me, know [sic].

"Q. And what did you observe that caused you concern?

"A. Primarily just looks and breath .. *I had reason to assume that he might be under the influence.*

"Q. Did you ask him if he had been drinking?

"A. Yes, ma'am.

"Q. And what was his response?

"A. He told me that he hadn't had a drink for 2½ hours.

"Q. Did you have reason to doubt that?

"A. No, ma'am, because the bars close about 1:00, so..

"Q. All right, was there a problem with his having had a drink 2½ hours before, or was it his current physical condition?

"A. It was the current condition that he was in at the time that he came to work.

"Q. Did he appear to be stable in his walk?

"A. I really couldn't say .. *I didn't pay that much attention to how he walked.*

"Q. Did you observe that his speech was normal?

"A. Well, I wouldn't say it was normal.

"Q. *What was not normal about it?*

"A. Well, *just the way that he talked .. one thing, the way that he answered the questions.*

"Q. Can you tell me how it was?

"A. Oh, not exactly, no. *First he was on the defensive .. that might have had something to do with it. Just a manner of speaking, I guess.*"

R., pp. 11–13.

Upon cross-exaimination, which was conducted by the uncounselled claimant Dingley, Menter qualified his statement, that he had been watching for Dingley to arrive after seeing his pickup downtown, by denying that there had been an assumption on his part that Dingley had been out partying because his pickup was downtown. In addition, in a response to a question by Dingley based on *a letter* which had been sent *from the Gibbens Company* on behalf of Boise Cascade *stating that Dingley had reported to work* on the morning in question *"intoxicated and late,"* Menter stated: "At no time did I say you were intoxicated. I said you were *apparently* under the influence, *in my judgment.*"

The substantial evidence which the majority finds to support the conclusion that Dingley arrived at work under the influence of alcohol might be summarized as follows: (1) the fact that Dingley drank not more than three beers from two to five hours before arriving at work; (2) the opinion of Dingley's supervisor that Dingley was apparently under the influence of alcohol, which opinion was based upon the facts that the supervisor smelled alcohol on Dingley and that he thought Dingley's speech was defensive in the abnormal. To my mind such does not constitute "substantial competent evidence," especially when one considers that:

"While alcohol rapidly disappears from the mouth after ingestion, the aromatic materials of the beverages, like those in other foods, linger and are detectable for a relatively long time. The breath odor after drinking is, therefore, unrelated to

the alcohol content of the blood and *is a poor indicator* of the alcoholic state of the individual."

R. Gray, *Attorneys Textbook of Medicine* § 133.10 (3rd ed. 1969). (Emphasis added.)

Given the fact that the question in this case is a close one, it is important to point out that while a claimant of unemployment compensation benefits bears the burden of proving his or her eligibility for benefits, when an employer challenges the claimant's entitlement on the basis of a discharge for misconduct, I.C. § 72–1366(f), that employer must carry the burden of proving that the employee was in fact discharged for employment-related misconduct. *Parker v. St. Maries Plywood,* 101 Idaho 415, 614 P.2d 955 (1980). In this case, where the evidence is in equipoise, I find it troubling that the majority fails to consider that the employer had the burden of proving misconduct. I think it is also important to consider Dingley's testimony that Menter had other motives for suspending him, to wit, that Menter had given Dingley a verbal reprimand or warning for being late on January 5, 1981, notwithstanding that he had been told by another supervisor that drivers could warm up their trucks after reporting for work, whereas Menter expected the drivers to warm up the trucks on their own time. Dingley further testified that he and Menter had had an earlier dispute at a sawyers' meeting about the price to be paid for falling timber, and that there had developed a "certain friction." Thus, there is definitely evidence in the record suggesting that the supervisor's conduct was retaliatorily motivated.

It is important to remember that the issue here is not whether the employer was justified in firing Dingley. If my memory of employment law continues to serve me, a private employer is generally at liberty to discharge an employee for what is believed to be good reason, or for no reason at all. The question remains, however, whether substantial competent evidence supports a Commission finding that the discharge was for misconduct in connection with his employment, thereby creating an ineligibility for unemployment compensation benefits. Given the state of the record and the fact that the burden of proof was on the employer to demonstrate that Dingley was discharged for misconduct in connection with his employment, it is with much difficulty that I accept the majority's undeclared conclusion that substantial competent evidence supports the Commission's decision; were the majority to point out or discuss the evidence it finds to support that decision, my task would be easier. Were there not the questionable involvement of the Gibbens Company, then, too, I might see the majority's determination in a more favorable light. While the uncounselled Dingley conducted his own case commendably, I wonder at the outcome had he not been confronted with a sophisticated and experienced adversary who makes a business out of opposing claimants. Too, I wonder what emphasis, if any, the majority puts on the uncontradicted evidence that claimant was often required to, and did, work extremely long shifts, apparently without problem, in one instance working eighteen hours in a day and twenty-one hours the following day, after only one hour of sleep.